## WHITTINGTON OWENS *v.* STATE OF MISSISSIPPI.

1. CRIMINAL LAW.    *Witness.    Inducement to testify.*

    Where a state's witness, who had been convicted of the crime,
    stated upon cross-examination on the trial of his co-defendant
    that no inducement had been offered him to testify as he had
    done, the state should not be permitted to prove the truth of the
    statement by the prosecuting attorney.

2. SAME.    *Murder.    Accessory before the fact.    Code* 1892, § 950.    *Sudden
    altercation.    Instruction.*

    Where the state proceeds in a murder case on the theory that
    the defendant was an accessory before the fact (under the
    statute, code of 1892, § 950, a principal) and had armed and in-
    stigated an hireling to aid two other persons in committing the
    murder, it was error to refuse defendant an instruction, there
    being testimony of which to predicate it, directing the jury to
    acquit, if they believed from the evidence that the hireling killed
    deceased, not in pursuance of defendant's instigation, but alone
    because of a sudden and unexpected altercation between de-
    ceased and one of the two persons mentioned.

---

---

3. SAME.  *Verdict.  Ambiguity.*

> Where the terms of a verdict are ambiguous the court is authorized and under a duty to have the jury make their meaning plain.

4. SAME.

> In a murder case, the jury being authorized upon conviction to fix defendant's punishment at imprisonment for life in the penitentiary, a verdict in these words, "We, the jury, find the defendant guilty as charged in the indictment, and fix the penalty to serve a term in the state penitentiary, and ask the mercy of the court," is insufficient to support a judgment sentencing defendant to the penitentiary for life, each juror having stated upon the return of the verdict, in response to the court, that he did not mean that a death sentence should be imposed and most of them that the word "term" in the verdict meant less than life imprisonment.

FROM the circuit court of Marshall county.

HON. PERRIN H. LOWREY, Judge.

The appellant, Owens, was indicted by the grand jury of Lafayette county, for the murder of one John A. Montgomery, was tried and convicted and sentenced to death.     He appealed therefrom to the supreme court and the conviction was reversed. See *Owens* v. *State,* 80 Miss., 499.     The former report of the case gives a statement of the facts.     The reader, however, is referred as well to the case of *Matthis* v. *State,* 80 Miss., 491, and to the footnote on page 493 of said volume.     After the remand of the case, a change of venue was granted Owens on his application, to Marshall county, where he was again tried and convicted, from which, his motion for a new trial having been overruled, the present appeal was prosecuted by him to the supreme court.

Owens, appellant, was also indicted by the same grand jury for the murder of Hugh Montgomery, a brother of decedent in this case, and he was also indicted for the murder of one Williams, and was tried and convicted of this last crime and appealed to the supreme court.     See *Owens* v. *State, post,* 31.

Matthis, who had been convicted of the crime (and since hanged), testified in the present case for the state.     On his

cross-examination, he stated that no inducement had been offered him to testify as he had done. . The state, over the objection of defendant, was permitted to prove the truth of the statement.

In the course of his examination, Matthis further testified, on cross-examination, that "I went into the room with the two Montgomerys for them to go to bed, and Hugh Montgomery had taken a pistol away from me in August, and put me in jail, and gave the pistol to the jailer; John Montgomery got to bed first, and I held the light for them to get to bed, and sat down on the footboard, and Hugh sat down and talked, and finally pulled off his coat, and pulled off a scabbard and laid it under his pillow, and then pulled off his pants, and I asked Hugh to 'let me see that pistol you pulled off the scabbard,' and he says, 'I will show it to you some other time,' and I said, 'Let's see it now.'    I had seen the handle, and knew it was mine.    I says, 'You told me a damned lie about that pistol; you have got it, and I want it;' and he grabbed around for his pistol, and .says, 'God damn you, I will take you to town to-night,' and as he done that the negro (Orlandus Lester) jumped in the door and shot Hugh on the side of the head, and John was reaching around for his pistol, and he shot John."

The fifteenth instruction asked for defendant and refused was as follows: "The court further instructs the jury that, although they may believe from the evidence that the witness Lester went to the house of defendant of his own accord, or was sent there by Matthis on the night of the killing of said officers, and that he (Lester) told defendant that the officers were at Matthis' house, and that he, or he and Matthis, wanted to. kill said officers, and that the defendant gave Lester some buckshot shells and told him to go back to Matthis' house and kill said officers, and that the negro (Lester) did go back to the house of Matthis, where the officers were, and attempted to kill said officers, but was prevented by said Matthis from doing so, and that afterwards, and on the same night, Matthis and Hugh

Montgomery engaged in a quarrel about a pistol, and that while they were so engaged the negro (Lester) shot and killed said officers, not because Owens had told him to do so, or had in some way influenced him, but alone, because of the trouble between Matthis and Hugh Montgomery, then the jury should find the defendant not guilty."

The opinion of the court contains a further statement of the facts.

*Stephens & Stephens,* for appellant.

It was error to permit the district attorney to go upon the witness stand in order to bolster up his own witness.

There had been no charge that anyone, much less the state's attorney, had bribed or persuaded Matthis to testify.    1 Greenleaf, 469; *Madden* v. *State,* 65 Miss., 176; *Head* v. *State,* 44 Miss., 751, and *Williams* v. *State,* 79 Miss., 555.

The fifteenth instruction asked by defendant, and which was refused by the court, should have been given.

Owen is not to be held responsible for what was done in a difficulty that was wholly disconnected with the plot and plan made by him and the negro.    Although he may have planned and arranged with Lester to kill the Montgomerys, and Lester left him fully intending to do so, yet if Lester decided not to kill the men, but afterwards did kill them, not because of anything Owen had said or done in the matter, but for another reason, then Owen was not a party to the affair.

The instruction simply carries the idea that if the negro abandoned, from any cause, the design to kill these men according to Owen's instructions or advice, but afterwards killed the men because of some other reason or influence, then the jury must find the defendant not guilty.    The testimony of Matthis warrants the theory that Lester shot the officers because he, Matthis, was engaged in a difficulty with them.

It is the right of a defendant to have the jury instructed upon any theory that may be reasonably deduced from the evidence, and the refusal of this instruction was reversible error.

The verdict of the jury in this case is an absolute nullity; it is not such a verdict as the law warrants or recognizes in cases of this kind; no legal judgment could rightfully be pronounced upon it.

The court ought, either to have required the jury to put their verdict in legal form, or have declared a mistrial. At best it simply amounted to a mistrial, 'for there was no unanimity of consent among the jurors; and therefore no absolute and complete finding, for unanimity of consent is declared to be indispensable to the sufficiency of a verdict.

The written verdict was cloudy and ambiguous, and in attempting to clear it up and rid it of its ambiguity, as it was the duty of the court to do, it was unmistakably shown that the jury had not really agreed upon any verdict at all.

This court has held that the thing to be ascertained is the will and intention of the jury. The words employed in a verdict are the mere vehicles for conveying the jury's will; and where there are words in the verdict raising an apparent cloud as to what the actual intent and finding of the jury is, the court should dispel that cloud and have the jury make plain their meaning.

The oral statements of the jurors show beyond peradventure that they would never have returned a verdict under which they knew Owen would have either to hang or be imprisoned for life. *Smith* v. *State,* 75 Miss., 542, and authorities therein cited; Chamberlain's Best on Evidence, sec. 591; Clark's Criminal Procedure, 483, and cases cited; 43 Ala., 320; *Davis* v. *Searcy,* 79 Miss., 292.

*Monroe McClurg,* attorney general, for appellee.

The district attorney testified in response to the questions put to Matthis that he had been promised clemency if he should testify in the case against Owens. It was not only proper for the district attorney, who prosecuted for the state, to relieve the minds of the jury as to any supposed misconduct on his part, but it was competent rebuttal testimony tending to show the

falsity of that proposed by the defendant appellant.   There
is no reversible error found in this proposition.   At most, it
went to the credibility of the witness Matthis, and was, in fact,
worth nothing more either for or against the accused Owen,
who was not on the stand, or otherwise making a confession.
It was irrelevant matter.   *Madden's Case,* 65 Miss., 176.
That case was not reversed because of the admission of such
irrelevant testimony, and doubtless would not have been
reversed at all but for the testimony admitted as to public
sentiment.   There is nothing in *Williams' Case,* 79 Miss.,
555, touching this point.

   "What do you mean by your verdict?"   This question was
addressed to the proposition as to whether the jury meant to
say "guilty" or "not guilty."   It cannot be lawfully otherwise
propounded.   Not a single juror of the twelve put upon a
public gibbet in the presence of the defendant, counsel, inter-
ested friends, and a curious public, stated that he opposed a
verdict of guilty — all were agreed on that — but each stated
what he thought the law ought to be in such case.   The trial
judge let his foot slip in going into this unauthorized procedure,
nevertheless found the correct meaning of the verdict twice
rendered; namely, that the jury was unanimous in believing
the defendant guilty as charged, but that none of them desired
that he should be hung.   He merely announced the law in such
case by pronouncing the life imprisonment sentence.   The
purpose and intent of the law was certainly reached.   Guilty
of murder, but not to be hung.   The law fixed the life sentence
in such case, and the court so correctly ruled in his judgment.
The legal effect of the verdict was unquestionably announced
by the court.   This case will not be reversed because the mem-
bers of the jury had divergent notions as to what the penalty
should be.   The jury was unanimous in a verdict of guilty as
charged, and that the accused should not be hung.   All else
were surplusage — almost judicial folly.   The verdict was
responsive to the issue.   *Smith's Case,* 75 Miss., 551; *Penn's*

*Case,* 62 Miss., 450; *Traube's Case,* 56 Miss., 153; *Timmon's Case,* 56 Miss., 786; *Bedell's Case,* 50 Miss., 492; *James' Case,* 55 Miss., 57; *John's Case,* 78 Miss., 665; *McGuire's Case,* 76 Miss., 504.

On the single refused instruction there can be no possible substantial complaint. The other instruction granted at the request of the accused, especially the fourteenth, covered the whole case, and presented the full defense, even the theory contained in the refused instructions.

Argued orally by *H. D. Stephens* and *W. V. Sullivan,* for appellant, and by *William Williams,* attorney general, for appellee.

Whitfield, C. J., delivered the opinion of the court.

It was error to permit the district attorney to testify that no inducement had been offered Matthis to testify against Owens. Matthis had expressly stated, himself, when asked, that no inducement had been held out. The only possible effect of this testimony was to permit the state to bolster the testimony of its witness, Matthis, in this unwarranted way. This has been expressly condemned twice by this court. *Madden* v. *State,* 65 Miss., 176; 3 South., 328, where the court said: "On the trial, one Morris, indicted for the same offense, was introduced by the state as a witness. He distinctly and fully testified to the guilt of the appellant on direct examination. On cross-examination he stated that some days after the burglary, and while he was confined in jail, he sent for the attorneys who had been engaged to prosecute the parties charged with the crime, and, being informed by them that any one of the number who would divulge all the facts would not be prosecuted, he determined, as he says, 'to make a clean breast and come clear.' To break the force of this statement, the state was permitted, over the objection of appellant, to prove by the counsel referred to by the witness, that no such promises were made. This should

never have been permitted. Whether the statement made by the witness on cross-examination was true or untrue was not relevant to the guilt or innocence of the defendant. The single purpose of the state in contradicting that statement was to break its force and effect as going to show that the inculpating testimony delivered on direct examination had been induced by promises of immunity from punishment. It was an effort to support the evidence given on direct examination, and to discredit that drawn out on cross-examination, and it was not competent to do either. ˙ A witness cannot be corroborated by proving that on other occasions he had made statements conforming to his testimony, for such statements are but hearsay; nor can one who introduces a witness directly attack his credibility by proving facts irrelevant to the issue." And *Williams* v. *State,* 79 Miss., 555; 31 South., 197.

It was error to refuse the instruction (numbered 15) asked by the defendant. The idea presented in this instruction is that, if Lester killed the officers, not because of anything Owens had told him to do, but merely and solely to protect Matthis, the appellant would not be responsible for that; and the testimony of Matthis furnished the defendant with a basis on which to predicate his right to this instruction. The fourteenth instruction granted for the defendant does not cover this precise proposition, and the refused instruction, being a correct proposition of law, ought to have been granted. The defendant has the right to have the jury instructed upon any theory that the testimony may reasonably present. It must be admitted that Matthis' testimony was certainly sufficient to justify the giving of this instruction. As to the truth or falsity of Matthis' testimony in this connection, we, of course, make no comment.

The jury first returned into court this verdict: "We, the · jury, find the defendant guilty as charged, and ask for the mercy of the court." This clouded verdict needed to be cleared up, as held in *Smith* v. *State,* 75 Miss., 556; 23 South., 260. This jury had been fully instructed as to the form of the ver-

dict, as had the jury in the *Smith Case,* and what was said in the *Smith Case,* reviewing the authorities on that proposition (*Penn* v. *State,* 62 Miss., 477; *Shines* v. *State,* 42 Miss., 333; and *Gipson* v. *State,* 38 Miss., 310), is directly in point in this case.     We stated then, and now reaffirm the proposition: "The thing to be ascertained is 'the will and intention of the jury' in their finding.     That is what the court should know, that the proper sentence of the law may follow upon their actual finding, not upon what is not their actual finding.     Of course, the legal effect of the verdict in this case, in the words used, is, by legal construction, death.     But the words employed in a verdict are the mere vehicle for conveying the jury's will; and where there are words in the verdict raising an 'apparent cloud' as to what the actual intent of the jury is, the court, whether asked or not, should 'dispel that cloud,' and have the jury make plain their meaning.     And the court, of course, had the amplest power to do this, and, if necessary, to send them back to the jury room to render a clear and unambiguous verdict; and most especially should this ample power be exercised in a capital case."

Following this announcement, in 75 Miss., 23 South., the learned court below sent the jury back to put their verdict in proper form, the court having first asked the jury what they meant by the "mercy of the court," and a member of the jury having said, "We thought he should have been put in the penitentiary."     This occurred at 6 o'clock in the afternoon, and at 6.40 the jury returned a second verdict in the following words: "We, the jury, find the defendant guilty as charged in the indictment, and fix the penalty to serve a term in the state penitentiary, and ask the mercy of the court."     When this verdict was rendered, one of the jurors, Simpson, said: "I would like to explain.     Before we assessed any time, we knew we could not fix any length of time, and we thought by asking the mercy of the court it would be all right; we did not have the form properly drawn up."     The jury did have the forms properly given in the instruction, and, if the learned circuit judge had

simply directed the jury to go back and read the instruction as
to the form of their verdict, and then render a proper verdict,
it would have been a very easy thing for the jury to have done
that, if they had really agreed on a verdict; or if, as the record
discloses was the fact, they had not really agreed on any verdict,
a mistrial could have been entered.    When this second verdict
was rendered, the court first polled the jury in the usual way,
and then each juror was asked what he meant by the verdict.
Juror Frazier said that he "meant for the judge to fix the num-
ber of years, even if it extended to the life sentence"; Juror
Higgins said that he "meant from twenty to twenty-five years
in the penitentiary, and that he did not mean life imprison-
ment in the penitentiary"; Juror Puryear said that he "meant
from twenty to twenty-five years, and did not mean life impris-
onment"; Juror Wade said he "meant to leave the term of
years to the judge, even if it meant life imprisonment"; Juror
Eason said the same thing; Juror Crawley, that he "did not
mean life imprisonment, but left it subject to the judge as to
time"; Juror Hart said that he "meant about twenty-five
years"; Juror Mobly said he "left it to the judge as to time,
but did not mean life imprisonment," adding, "We did not
expect it to be made for life is the reason we asked the mercy
of the court"; Juror Hardin said, "I could not hang him,
according to my view of the testimony, and thought he deserved
ten or fifteen or twenty years in the penitentiary.    I did not
think he deserved life imprisonment"; Juror Morton said that
he "left it to the court, except that he did not mean life impris-
onment"; Juror Simpson said that he "left the time to the
court, but intended a very short term — five, ten, or fifteen
years—did not mean life imprisonment"; Juror Sharp said
that he "meant twelve months in the penitentiary; he did not
mean life imprisonment."    Each and every one of the jury,
asked by counsel for the state and for the defense, expressly
stated that no one of the jury meant that the defendant should
be hung.    The court seems to have directed the verdict to be

entered up in the following form: "We, the jury, find the defendant, Whit Owens, guilty as charged in the indictment, and fix the penalty at imprisonment in the state penitentiary for life." It is perfectly obvious that no such verdict was rendered by the jury, and it is equally obvious that the jury had not agreed upon any verdict at all.

To show what an utterly clouded verdict it was, we have, on the one hand, the action of the court directing the verdict to be entered in the form we have just given, and sentencing the prisoner upon the verdict to imprisonment in the penitentiary for life; and we have the district attorney, on the other hand, actually excepting to the action of the court in not sentencing the prisoner to be hanged. It is plain that the court did what he did because he thought the legal effect of the verdict was imprisonment for life. It is also plain that the district attorney based his exception upon the idea that the legal effect of the verdict was a simple finding of guilty of murder, upon which the death penalty should follow. No more conclusive proof of the utterly clouded state of this verdict could be furnished than the spectacle of the judge and the district attorney disagreeing as to what the verdict meant. The only strange thing is how there could be any difference of opinion as to the real nature of the verdict. It seems to us perfectly plain that the jury had not agreed upon the number of years, differing about that from twelve months to life imprisonment, and hence that they had really reached no legal verdict upon which the judgment of the law could follow. It is the duty of the jury to sentence the prisoner to life imprisonment, where that is to be done — not the court. The learned judge below was entirely correct in refusing to enter the death penalty when every member of the jury said that was not his verdict; but he erred in treating the verdict as a sentence for life imprisonment at the hands of the jury. The matter was of exceedingly simple solution. It would have been perfectly proper for him to have taken from the charges for the state the one as to the form of their verdict,

and directed the jury to retire, read that charge, and put their verdict in form.    Jurors are men unlearned in the law, and there could be no possible objection to the court's selecting and handing to them the charge as to the form of their verdict when form was the only thing involved.    Had this been done, the jury would very soon have disagreed, or returned a proper verdict.    From the testimony, it would seem that they would doubtless have disagreed.    At all events, the one result or the other was certain.

We are of the opinion that this verdict was not a legal verdict — not one upon which the judgment of the court could have been legally pronounced.    The precise case was decided in *Weatherford* v. *State,* 43 Ala., 320, where the court said: "The appellant was indicted in the city court of Mobile for the crime of rape.    On the trial, the jury returned a verdict in the following words, to wit: 'We, the jury, find the prisoner guilty, as charged in the indictment, and sentence him to imprisonment in the penitentiary.'    Before he was sentenced by the court, the prisoner, by his counsel, moved to arrest the judgment for the following reasons: '(1) Because the verdict rendered in the case by the jury is contrary to law, and does not declare what the punishment shall be.    (2) Because the court cannot pass sentence upon the verdict rendered in the case, the court having no power or discretion to fix the length of time of imprisonment, and the jury having to fix the same, it being their province to do so.'    The court overruled the motion, and sentenced the prisoner to hard labor in the penitentiary for his natural life.    The prisoner excepted to the ruling and sentence of the court.    The judgment of the court was suspended, and the case is here for revision.    Section 3661 of the code provides that 'any person who is guilty of the crime of rape, must, on conviction, be punished, at the discretion of the jury, either with death, or by imprisonment in the penitentiary for life, or by hard labor for the county for life.'    The entire punishment for this crime is in the discretion of the jury, and the court has

nothing to do in the matter, but to pronounce the sentence of
the jury.     The attorney general argues that the law determines
the duration of the punishment, where it is either in the peni-
tentiary, or hard labor in the county.     This is true, but, not-
withstanding, it must be found by the jury, and not fixed by the
court.     Who can tell but, if the jury had been instructed that
imprisonment in the penitentiary must be for life, they might
not have determined to inflict the milder punishment, to wit:
hard labor for the county for life?     But why speculate about
this matter?     The wiser and safer course is to do just what
the law requires, and to do it in the way the law requires.     We
have determined at this term, in the case of *Edgar* v. *State,* a
case very like this, that the jury must, by their verdict, deter-
mine both the character and extent of the punishment."

What is said in this case about the entire punishment being
in the discretion of the jury, under the section cited from the
Alabama code, applies perfectly to that part of a sentence in a
murder case under our law which fixes the punishment at im-
prisonment in the penitentiary for life.     Whether that shall
be the sentence is for the jury, and not the court, to say.

Two things were made certain by the testimony elicited from
the jurors in this case: First, that not a single juror meant by
his verdict that the death sentence should be imposed; second,
that ten of the jurors meant he should not be imprisoned in the
penitentiary for life.     We think it is equally certain that, not
meaning he should be hung, and differing about how long he
ought to be imprisoned in the penitentiary — from a twelve
months' period to a life period — the jury had never really
agreed upon any verdict.     Had the court pursued the course
indicated, there would have been a verdict upon which judg-
ment could have been legally pronounced, or there would have
been a mistrial.     It was the duty of the court, under the cir-
cumstances, to have required the jury to go again to their room,
read the charge as to the form of the verdict, and then return —
if they agreed — a legal verdict in proper form.

There are other errors complained of, but, as they are such as would not likely occur again, we have noticed only those which are vital.

*Reversed and remanded.*